UNITED STATES of America and Donald M. Cerra, Special Agent of the Internal Revenue Service, Appellees,

v.

John L. BEATTIE, Jr., Appellant.

No. 1305, Docket 75-6041.

United States Court of Appeals, Second Circuit.

Argued July 17, 1975.

Decided Aug. 18, 1975.

Sidney R. Rubin, Rochester, N. Y. (Rubin, Levey & Battaglia, Rochester, N. Y., of counsel), for appellant.

Robert E. Lindsay, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Washington, D. C., Richard J. Arcara, U. S. Atty., W. D. N. Y., Buffalo, N. Y., Gilbert E. Andrews, Atty., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellees.

Before MOORE, FRIENDLY and VAN GRAAFEILAND, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal by John L. Beattie, Jr. (sometimes hereafter the taxpayer) from an order of the United States District Court for the Western District of New York pursuant to 26 U.S.C. § 7402(b) and § 7604(a), enforcing an Internal Revenue Service summons issued under 26 U.S.C. § 7602 despite Beattie's claim of self-incrimination.

The summons, dated September 13, 1974, required Beattie to appear before Special Agent Donald M. Cerra in Rochester, New York, and to bring with him and produce for examination:

All original workpapers of Arthur Robeson, C.P.A. which are in your possession and were used in the preparation of Form 1040 U.S. Individual Income Tax Return of John L. Beattie, Jr. and Margaret Beattie for the years 1968, 1969, 1970, 1971 and 1972 consisting of but not limited to the following: trial balances, balance sheet, adjusting entries, closing entries, workpapers, notes, memorandums and any correspondence used in the preparation of the aforementioned returns.

The petition for enforcement and an accompanying affidavit of Special Agent Cerra alleged that Beattie had appeared but had refused to produce the documents. It is not disputed that the principal purpose of Cerra's investigation was to determine whether to recommend that a criminal prosecution be initiated against Beattie with respect to his tax returns for 1968–72.

Beattie filed an answer and affidavits of his present attorney, of Robeson, and of himself. Beattie's affidavit stated that Cerra had informed him of the investigation on or about January 9, 1974, and had advised him of his constitutional rights to remain silent and to retain counsel. The affidavit went on to say that "On or about January 18, 1974, James W. Richards, Esq., acting as my attorney and on my behalf, and with my knowledge and consent, requested that my accountant, Arthur W. Robeson, deliver to Mr. Richards, for delivery to me, various work papers, trial balances, and schedules which Mr. Robeson had prepared as the accountant for me and for my business, Canteen Vending Company of Rochester, a sole proprietorship"; that

on or about the same day attorney Richards had delivered the papers to Beattie; that the papers had been in his continuous possession thereafter; and that his refusal to produce them for the special agent's examination was based on the privilege against self-incrimination conferred by the Fifth Amendment to the Constitution. The accountant's affidavit confirmed that attorney Richards had requested delivery of "certain work papers which I had prepared for Mr. Beattie and said business" and had stated his intention to turn them over to Beattie. The accountant added that since Beattie "had paid me for my accounting services, including the preparation of these papers, I felt that he was entitled to have them if he so desired," that the accountant had no need for the papers, and that accordingly he turned them over to attorney Richards.

The petition was orally argued. No one sought an evidentiary hearing, such as was held in *United States v. Fisher*, 500 F.2d 683 (3 Cir. 1974) (*en banc*), *cert. granted*, 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975) and the court conducted none. After holding the matter for some months, apparently in anticipation of the Supreme Court's review of *Fisher* and a companion case,[1] the court entered an order overruling Beattie's claim of privilege, without further explanation, and enforcing the summons.[2] This court granted a stay pending an expedited appeal.

The Supreme Court has granted certiorari to resolve the conflict between two other circuits involving a taxpayer's claim of privilege with respect to his accountant's workpapers, *United States v.*

---

1. See *United States v. Beattie*, Transcript of Proceedings, 16–19 (W.D.N.Y. 1/27/75).

2. Although the summons and the petition speak of testimony on the part of Beattie, the briefs and argument have been concerned solely with production of the accountant's workpapers and this opinion is limited to the requirement that Beattie produce them. See 8 Wigmore, Evidence § 2259b at 357–59 (McNaughton rev. 1961). Specifically we express no opinion on the continued viability of the ruling in *United States v. Austin-Bagley Corp.*, 31

F.2d 229, 233–34 (2 Cir.), *cert. denied,* 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929), with respect to the obligation of a person in Beattie's position to identify papers he has produced. Compare *Curcio v. United States,* 354 U.S. 118, 123–25, 128, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), with *United States v. Fisher, supra,* 500 F.2d at 694 (concurring opinion of Judge Gibbons). We likewise express no opinion on whether the privilege would attach to photocopies of Beattie's own records, since we do not read the summons to include them.

*Fisher,* 500 F.2d 683 (3 Cir. 1974) (*en banc*), denying the claim, and *United States v. Kasmir,* 499 F.2d 444 (5 Cir. 1974), sustaining it. However, in both those cases the taxpayer, after obtaining the workpapers from the accountant had transferred possession to his attorney, evidently believing although perhaps mistakenly, that two claims of privilege would be better than one. It is possible that the Court may dispose of the cases on the ground that, as in *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), compulsory process did not run against the person claiming the privilege, without reaching the question whether the taxpayer could have sustained the claim of privilege if he had retained possession.[3] We therefore deem it best to render a decision so that the Supreme Court may have this variation before it when it decides *Fisher* and *Kasmir.*

## I.

We speedily reject taxpayer's argument that *Couch v. United States, supra,* demands an almost automatic reversal. The holding in *Couch* was that the taxpayer's privilege did not attach even to his own records when these were in the possession of his accountant. It scarcely follows that the taxpayer's privilege does attach to the accountant's workpapers when these are in the possession of the taxpayer. The significance of *Couch* for the present case is in the language of the opinion, not in its holding.

We will be in a better position to evaluate this if we first review other decisions relating to the privilege and the considerations of policy that underly it.

We begin by noting that nothing turns on the fact that the self-incrimination clause of the Fifth Amendment provides that a person shall not "be compelled in any criminal case to be a witness against himself" whereas many state constitutions, including those of most of the original colonies, phrased the privilege in terms of compelling a person to give "evidence" against himself. *Schmerber v. California,* 384 U.S. 757, 761–62, n. 6, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), citing *Counselman v. Hitchcock,* 142 U.S. 547, 584–85, 12 S.Ct. 195, 35 L.Ed. 1110 (1890) and 8 Wigmore, Evidence § 2252 (McNaughton rev. 1961). However, recognition that the protection of the self-incrimination clause is not confined to the compulsion of oral testimony by the accused is still a considerable way from a conclusion that the clause protects against the production of evidence representing the statements of another person which are in the accused's possession. The *Schmerber* decision is an important datum against so much of taxpayer's argument as depends on a premise that the self-incrimination clause protects against compelling an accused to do anything that may assist the state in proving his guilt. As was there noted, "both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk or to make a particular gesture," 384 U.S. at 764, 86 S.Ct. at 1832. The Court went on to hold that the clause afforded no protection against requiring a defendant to allow his skin to be punctured so that the police could perform a blood test, as it was later to hold that the clause did not protect an accused from being forced to exhibit his person and use his voice, *United States v. Wade,* 388 U.S. 218, 221–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), or to give exemplars of his handwriting, *Gilbert v. California,* 388 U.S. 263, 265–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

Recognizing that the enforced blood test sustained in *Schmerber* violated certain policies of the privilege against self-

---

**3.** The Third Circuit seemingly doubted that he could, 500 F.2d at 691–92, and Judge Gibbons, concurring, clearly thought he could not, 500 F.2d at 693–94, whereas Judge Hunter, dissenting, thought the contrary, 500 F.2d at 695–97, as did the divided Fifth Circuit panel, 499 F.2d at 451–52.

incrimination, Mr. Justice Brennan justified the decision on the ground that "the privilege has never been given the full scope which the values it helps to protect suggest. History and a long line of authorities in lower courts have consistently limited its protection to situations in which the State seeks to submerge those values by obtaining the evidence against an accused through 'the cruel, simple expedient of compelling it from his own mouth . . .'", 384 U.S. at 762–63, 86 S.Ct. at 1831.[4] What "the protection of the privilege reaches" is "an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers, *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.'" 384 U.S. at 763–64, 86 S.Ct. at 1832.

The test, then, in cases relating to the production of papers, is whether the state is seeking to compel incriminating "responses which are also communications."[5] A subpoena demanding that an accused produce his own records is taken

to be the equivalent of requiring him to take the stand and admit their genuineness, see *Curcio v. United States,* 354 U.S. 118, 125, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); 8 Wigmore, Evidence, § 2264, at 380 (McNaughton rev. 1961).[6] While, as stated by Wigmore, "testimonial acts" of this sort (that is, the implicit assurance that the articles produced are the ones demanded) "are not typical of the sort of disclosures which are caught in the main current of history and sentiments giving vitality to the privilege," nevertheless "they are within the borders of its protection." 8 Evidence § 2264 at 380. A good reason for this is that if an accused is forced to produce his own papers, with the consequence that the prosecutor can put them in evidence without further ado, he is in effect forced to take the stand if he wishes to dispute or explain them.

■■■ However, in order to bring a case of compelled production of papers within the privilege, the process must elicit not simply "responses which are also communications" but communicative

---

**4.** The inner quote is from Chief Justice Warren's opinion for the Court in *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** The *Schmerber* opinion made clear that this test is not satisfied by the fact that the object obtained from an accused would be used by the prosecution to secure the testimony of others, here testimony by the accountant with recollection refreshed by his workpapers. 384 U.S. at 761 n. 5, 86 S.Ct. 1826.

**6.** We do not regard the statement in footnote 7 to the *Schmerber* opinion, 384 U.S. at 763, 86 S.Ct. at 1832, that the holding "is not to be understood as adopting the Wigmore formulation" that the privilege "was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt which would take the place of other evidence" citing 8 Wigmore, Evidence § 2263 (McNaughton rev. 1961) (emphasis in original) as inconsistent with this conclusion. We take the statement as a disclaimer of acceptance of any view, inferable from § 2263, that the privilege applies only to compelled oral communications, not as a repudiation of the explanation in § 2264 that compelled production of an accused's own papers is within the privilege because of the authentication implicit therein.

The Court had previously stressed the authentication factor in *United States v. White, infra,* 322 U.S. at 698, 64 S.Ct. 1248, and in *Curcio v. United States, supra,* 354 U.S. at 125, 77 S.Ct. 1145. It was to do so again in *Couch, supra,* 409 U.S. at 330–31, 93 S.Ct. 611; indeed Mr. Justice Marshall there stated unequivocally in dissent that the authentication "interpretation of *Boyd* has been accepted by this Court and by the leading commentators," citing *Curcio,* § 2264 of Wigmore, and McCormick, Evidence §§ 126–127 (2d ed. 1972), 409 U.S. at 346, 93 S.Ct. at 624. Indeed, in the sentence immediately following the call to footnote 7, in *Schmerber* the Court said:

It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce *one's own papers. Boyd v. United States,* 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746] (emphasis supplied).

The correctness of Wigmore's formulation in § 2264 is also shown by the applicability of the privilege to the accused's compulsory production of chattels, which are not themselves communications and are relevant only circumstantially.

responses tending to incriminate. It is here that the taxpayer's argument breaks down. By responding to the summons in this case, the taxpayer would not be admitting the genuineness, correctness or reliability of the accountant's workpapers. He would be admitting only his present possession of them—a fact of no significance in a criminal trial for filing false returns for 1968–72. Whereas the prosecution could offer in evidence an accused's own records produced by him in response to process without further authentication, it can make no such use of an accountant's workpapers as proof of the facts therein recited without testimony by the accountant as to how he produced them, and the accountant has no privilege to refuse to give evidence incriminating his client. The prosecution cannot even prove that the taxpayer had seen the workpapers at the time of filing the returns without further testimony by someone. If the incriminating communication involved in producing one's own records lies only at the "borders of the privilege," as stated in 8 Wigmore, *supra,* at 380, the non-incriminating communication involved in producing another's papers would seem as a matter of principle, to fall outside them.

■ We think this to be the teaching of the Court's decisions in the only field where it has given extensive consideration to the issue whether compelled production of other people's papers by an accused is within the privilege. These are cases where an accused has possession of records of a corporation, a union, or a partnership which tend to incriminate him. It is settled that the possessor cannot refuse to produce such records even if the incriminating entries were made by himself, 8 Wigmore, Evidence § 2259b at 355–56 and n. 2, although the implied communication made by the production is of far more assistance to the prosecution than any such communication to be made here.

It is worthwhile to review the three leading cases enunciating this principle.

The first is *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). This dealt with a subpoena requiring United Wireless Telegraph Company to produce those letter-press copy books which contained copies of letters and telegrams signed by its president, C. C. Wilson, in regard to an alleged violation of federal statutes by him. Wilson, who had possession of the copy books, refused to produce them on the ground that the letters and telegrams might tend to incriminate him. The court, speaking through Mr. Justice Hughes, denied the claim of privilege. Citing *Boyd v. United States, supra,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, and *Ballmann v. Fagin,* 200 U.S. 186, 195, 26 S.Ct. 212, 50 L.Ed. 433 (1906), for the proposition that the privilege protected Wilson "against the compulsory production of his *private* books and papers" (221 U.S. at 377, 31 S.Ct. at 543, emphasis supplied), the Court held that the privilege did not extend to Wilson's letters and telegrams which were corporate records, merely because Wilson had obtained lawful possession of them. The Court said, 221 U.S. at 380, 31 S.Ct. at 544:

> But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held. It may yet appear that they are of a character which subjects them to the scrutiny demanded and that the custodian has voluntarily assumed a duty which overrides his claim of privilege. This was clearly implied in the *Boyd* case, where the fact that the papers involved were the *private* papers of the claimant was constantly emphasized. (emphasis in original)

Relying on its decision in *Hale v. Henkel,* 201 U.S. 43, 74–75, 26 S.Ct. 370, 50 L.Ed. 652 (1906), that a corporation was not privileged from self-incrimination, the court went on to hold that, by acquiring

possession of the books, Wilson could not prevent the company from complying with its duty of producing them.[7]

*United States v. White,* 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), posed a similar question except that the records sought were those of a union which were in the possession of White, an "assistant supervisor." The Court reversed a decision by a divided Third Circuit panel upholding a claim of privilege if White could prove he was a union member and thereby part owner of the union records. It said that the privilege was "designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce *and authenticate* any *personal* documents or effects that might incriminate him." 322 U.S. at 698, 64 S.Ct. at 1251 (emphasis supplied). It concluded, 322 U.S. at 704, 64 S.Ct. at 1254:

> Nor could respondent claim the privilege on behalf of himself as an officer of the union or as an individual. The documents he sought to place under the protective shield of the privilege were official union documents held by him in his capacity as a representative of the union. No valid claim was made that any part of them constituted his own private papers. He thus could not object that the union's books and records might incriminate him as an officer or as an individual.

The rationale for these cases has been variously stated: sometimes it is said that the person has implicitly waived his privilege by assuming custodial responsibility[8] for the records of another entity, and this point is emphasized in the corporate context since the "visitorial" power of the state and hence the availability of corporate records, are well-established; sometimes it is said that where a group has a "superior right"[9] of possession to documents, no other entity could claim a privilege barring the document's production since the government could compel the group to bring forth its papers and the group could do the same to the incriminated party.[10] Perhaps a mingling of these reasons is achieved by

---

**7.** A companion case, *Dreier v. United States,* 221 U.S. 394, 31 S.Ct. 550, 55 L.Ed. 784 (1911), made clear that the *Wilson* decision did not depend on the fact that the subpoena was directed to the corporation; *Dreier* reached the same result where the subpoena was directed to the officer possessing the documents that were claimed to incriminate him.

**8.** See *Wilson, supra,* 221 U.S. at 382, 31 S.Ct. 538; *White, supra,* 322 U.S. at 699, 64 S.Ct. 1248.

**9.** See, e. g., the A.L.I. Model Code of Evidence, Rule 206:

> No person has a privilege under Rule 203 [self-incrimination] to refuse to obey an order made by a court to produce . . . a document . . . under his control constituting, containing or disclosing matter incriminating to him if the judge finds that . . . some other person . . . has a superior right to the possession of thing ordered to be produced.

It is settled that one entitled to possession of a document can obtain it from a person possessing it even though the document would incriminate the possessor and that it may thereafter be used as evidence. *Matter of Harris,* 221 U.S. 274, 31 S.Ct. 557, 55 L.Ed. 732 (1911); *Johnson v. United States,* 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913).

**10.** Wigmore finds both rationales wanting, and is characteristically pragmatic:

> Neither of these reasons will stand analysis. The first, based on waiver, begs the question. The custodian waives the privilege only because the cases beginning with *Wilson v. United States* have so held . . . . . The second reason, based on a right to possession, is simply irrelevant. The sentiments which bar the *state* from requiring a person to deliver to it a self-incriminating document are logically unrelated to the fact that someone *else* . . . can require the person to deliver up the document to someone else. The reason why the privilege is not available to the custodian is that in this class of cases the arguments supporting efficiency of law enforcement are more persuasive, and the sentiments behind the privilege are less appealing, than in the usual case. . . . [E]conomic crimes . . . are usually not even *discoverable* without access to business records, [and thus] a rule which privileged the production of such records whenever they incriminated the custodian would result in many (rather than few) of the violators going free.

We find no need to resort to this argument.

Justice Frankfurter's terse conclusion that "The Court's holding [in *Wilson*] boiled down to the proposition that 'what's not yours is not yours.' " *Shapiro v. United States,* 335 U.S. 1, 58, 68 S.Ct. 1375, 1404, 92 L.Ed. 1787 (1948) (Frankfurter, *J.,* dissenting).

In our view it is this last notion—that neither possession nor ownership, within or without the corporate context, can transform someone else's documents into one's own for the purpose of asserting the privilege—which is the central conception of these cases. We are confirmed in this by the Supreme Court's most recent treatment of the subject, *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). This applied the *Wilson-White* principle to the records of a dissolved three-man law partnership. Bellis' secretary had doubled as the partnership bookkeeper under the direction of Bellis and the firm's accountant. When the partnership was dissolved, Bellis leaving to join a new firm, the records remained with the other two partners who continued as a new partnership. More than three years later, before issuance of a grand jury subpoena, Bellis had his secretary remove the records to his new office. The Court held that, despite the absence in *Bellis* of a retained "visitorial power" of the state over corporations or the special responsibilities of labor unions which had received some emphasis in *Wilson* and in *White,* respectively, Bellis could not assert the self-incrimination privilege against producing the records. Quoting from *White,* Mr. Justice Marshall emphasized "the Court's consistent view that the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only the nat-

ural individual from compulsory incrimination through his own testimony or *personal records.*' " [11] (Emphasis supplied.) Clearly the degree of incriminating "authentication" incident to Bellis' compelled production of records which had been compiled under his supervision far outran anything here required of Beattie. The Court emphasized its recent tendency to place increased reliance on privacy as the prime rationale of the privilege, 417 U.S. at 91, 94 S.Ct. 2179; it was largely because it could find no sufficient invasion of Bellis' privacy that it ruled as it did despite the absence of the special principles relating to corporations and unions. There seems to us to be much less invasion of Beattie's privacy by compelling the production of Robeson's work product, of which Beattie obtained possession only when a criminal tax investigation was in the offing, than there was of Bellis' by making him produce records compiled by his secretary under his own supervision in the ordinary course of the business of a small partnership.

It is true that in the three cases under discussion the Court stated that the claimant of the privilege was holding the records in a "representative" capacity, whereas Beattie is not, and that much is made of the "organized, institutional activity" of which the holder is a representative.[12] But these references were needed to explain how it was that an accused could be forced to produce incriminating records in his possession which in a real sense were very much his own; they afford no basis for an inference that because an accused is not acting in a representative capacity, he can extend the privilege to any incriminating papers or other objects he can manage to

11. The Court was confronted with a contention that the point argued by the Government in *Bellis* had already been decided against it in the *Boyd* case since the records there at issue were those of a partnership. Mr. Justice Marshall disposed of this, 417 U.S. at 95 n. 2, 94 S.Ct. at 2186, on the ground that the point had not there been raised and that the *Boyd* Court had "decided the case on the premise that it involved the 'compulsory production of a man's private papers.' " 116 U.S. at 622, 6 S.Ct. 524. Mr. Justice Douglas, dissenting,

"would treat a partnership as *Boyd* treated it," 417 U.S. at 103, 94 S.Ct. at 2190, and thought the Court was "effectively overruling Boyd . . .", 417 U.S. at 105, 94 S.Ct. 2179.

12. "Our conclusion is that it is the organizational character of the records and the representative aspect of petitioner's present possession of them which predominates over his belatedly discovered personal interest in them." *Bellis,* 417 U.S. at 99–100, 94 S.Ct. at 2189.

secure. These cases where the privilege has been denied are regularly contrasted by the Court with those in which the claimant is holding his own records. To put the matter in a slightly different way, denying the privilege as to incriminating records even when prepared by the accused in the ordinary course of business on the ground that he was holding them in a representative capacity cannot be reconciled with sustaining the privilege with respect to other people's papers of which an accused has acquired possession primarily for the purpose of withholding them from the Government. If anything, the latter is an *a fortiori* case for denial of the privilege. We do not think anything in *Bellis* really turned on the willingness of the other partners to make the records available to the grand jury, although this rendered "additional support" to the decision, 417 U.S. at 99, 94 S.Ct. 2179, any more than it would matter here whether Robeson did or did not now wish to make his workpapers available to the IRS.

In sum, it is not readily apparent to us what telling distinction there is between a taxpayer's holding partnership records, of which he has obtained possession in order to thwart a criminal income tax investigation, and his holding papers of an independent contractor which he has obtained for the same purpose.[13] In order to determine whether the difference may have a significance we do not immediately perceive, we turn to the policies and the history of the privilege.

### II.

The most comprehensive statement of the policies of the privilege was made in *Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964). We quote this, inserting numbers for convenient reference:

It reflects many of our fundamental values and most noble aspirations: (1) our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; (2) our preference for an accusatorial rather than an inquisitorial system of criminal justice; (3) our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; (4) our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load." 8 Wigmore, Evidence (McNaughton rev., 1961), 317; (5) our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life." *United States v. Grunewald,* 233 F.2d 556, 581–582 (Frank, *J.,* dissenting), rev'd 353 U.S. 391 [77 S.Ct. 963, 1 L.Ed.2d 93]; (6) our distrust of self-deprecatory statements; (7) and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964.

The values of the first policy are evident enough when oral testimony is sought, the area where the privilege began. As said in 8 Wigmore, Evidence § 2263 at 378–79 (McNaughton rev. 1961):

The history of the privilege—especially the spirit of the struggle by which its establishment came about—suggests that the privilege is limited to testimonial disclosures. It was directed at the employment of legal process to *extract* from the *person's own lips* an admis-

---

**13.** Beattie makes some point that over a week elapsed before attorney Richards gained possession of the accountant's papers and eight months elapsed before the summons was served. We fail to see how the case stands differently than if Richards had acted on the day after the Special Agent had warned Beat-

tie and the summons had been served the next day. There is no contention that the purpose was other than to put the workpapers within the range of the privilege as they would not have been if they had remained in the accountant's office, where some of them had reposed for nearly five years.

sion of guilt, which would thus take the place of other evidence. That is, it was intended to prevent the use of legal compulsion to extract from the person a sworn communication of his knowledge of facts which would incriminate him. Such was the process of the ecclesiastical court, as opposed through two centuries—the inquisitorial method of putting the accused upon his oath in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath. (Citations omitted)

They have a diminished although a sufficient force when the state is seeking production of the accused's own records. But they become attenuated almost to the vanishing point when the state seeks production of another's records which are in the accused's possession.

Such a case is not truly one of self-accusation. While an accountant's workpapers may have an investigative value, they would rarely be admissible against an accused without testimony by someone, presumably the accountant, which the state is free to compel. Indeed, a chief purpose of requiring production is to enable the accountant to testify more intelligibly, a purpose in no way offensive to the privilege, see note 5 supra. Perjury is not a real refuge as it is when the inquiry concerns something largely within the personal knowledge of the accused and the temptation to lie is encumbered mainly by conscience. Only a fool would deny the receipt of workpapers when the accountant would testify to their delivery; the temptation, as a practical matter, would thus be limited to a false claim of destruction or disappearance. But this possibility was present in equal degree in *Bellis.*

The second policy affords little help in deciding a particular case.[14] As was later to be demonstrated by Mr. Justice

Brennan in *Schmerber, supra,* "our preference for an accusatorial rather than an inquisitorial system of criminal justice" has not led us to the logical position that the state cannot compel an accused to do anything that may contribute to his conviction. What can and what cannot be compelled must be decided in light of the language of the self-incrimination clause, its history, and the other policies supporting it.

The third policy is so manifestly inapplicable to court enforcement of a summons that no discussion is required.

The fourth policy, like the second, comes within Mr. Justice Holmes' famous pronouncement, "General propositions do not decide concrete cases." *Lochner v. New York,* 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (dissenting opinion). As shown by *Schmerber, Wade* and *Gilbert,* we do not in fact require "the government in its contest with the individual to shoulder the entire load." What is "a fair state-individual balance" is the very question at issue whenever a new problem of the extent of the privilege arises. It is hard to see why a balance that would have been fair if an accountant's workpapers had remained with him would become unfair simply because a taxpayer in anticipation of a criminal investigation has taken possession of them with the accountant's consent; the amount of assistance given the government is precisely the same.

Leaving the fifth policy for further discussion, we can speedily dispose of the sixth and seventh as here applied. Our "distrust of self-deprecatory statements" sounds in terms of the thumb-screw and the rack and their modern counterparts. If forced to produce the accountant's workpapers, Beattie will be making no statement other than the implied one that these are the papers of which attorney Richards obtained possession. This is scarcely "self-deprecatory"; indeed, as indicated above it has no evidentiary significance at all. It is equally difficult to

14. See the statement by Dean McKay, a strong defender of the privilege, "Language like this, no matter how often repeated, no matter how eloquently intoned, is merely restatement of the privilege itself," Self-Incrimination and the New Privacy, 1967 Sup.Ct.Rev. 193, 209.

see how making it harder for the accountant to testify accurately by referring to his workpapers can be "a protection to the innocent."

Apart from an exceedingly attenuated application of the first policy, Beattie's case must therefore rest on the fifth, the argument with respect to privacy. The Court's most recent statements on this are in *Couch* and *Bellis*. The Court stated in *Couch* that the privilege "respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation." 409 U.S. at 327, 93 S.Ct. at 615. In *Bellis* the Court said that this inner sanctum "necessarily includes an individual's papers and effects to the extent that the privilege bars their compulsory production and authentication." 417 U.S. at 91, 94 S.Ct. at 2184, and that "Protection of individual privacy was the major theme running through the Court's decision in *Boyd,* see *e. g.,* 116 U.S. at 630 [6 S.Ct. at 532] . . .", 417 U.S. at 91, 94 S.Ct. at 2185.

Recognizing this, we fail to see how it assists Beattie. He had allowed, indeed invited, the accountant to prepare the workpapers and had permitted their retention by him for many years. Beattie's privacy would not have been impermissibly invaded if the Government had served the summons on Robeson before advising Beattie of the investigation. We fail to see why there is any greater invasion because the summons was served thereafter. The excerpts we have just quoted must be read in the light of such matters as that *Couch* related to the taxpayer's own books and records; that in a sentence immediately preceding his reference to the "private inner sanctum," Mr. Justice Powell had said, "By its very nature, the privilege is an intimate and personal one," 409 U.S. at 327, 93 S.Ct. at 615; that *Bellis* excluded from the inner sanctum the three-member law partnership records

which Bellis had maintained; and, more generally, that in both cases decision went against the assertion of the privilege, not for it. The accountant's workpapers were within his inner sanctum and, if he were accused of aiding and abetting a tax fraud, he could successfully have claimed the privilege if he had kept them. But, as distinguished from Beattie's own records where a transfer of possession would be significant, the accountant's workpapers could not be brought within the taxpayer's "private inner sanctum". By their very nature private inner sanctums are not transferable.[15]

### III.

We approach the *Couch* opinion with all this in mind. Taxpayer derives small benefit from the sentence in text most heavily relied upon, 409 U.S. at 333, 93 S.Ct. at 618:

> We do indeed believe that actual possession of documents bears the most significant relationship to Fifth Amendment protections against governmental compulsions upon the individual accused of crime.

This is little more than a statement of the holding, namely, that ownership of records will not support a claim of privilege if the incriminated owner is not the one compelled to produce them. The sentence surely does not mean that an accused can expand "the private inner sanctum of individual feeling and thought" by forays that will bring into his possession any incriminating material on which he can get his hands. Indeed Mr. Justice Powell was at pains to say, 409 U.S. at 336, n. 20, 93 S.Ct. at 620:

> We also decline to conjecture broadly on the significance of possession in cases and circumstances not before this Court.

Neither do we find decisive in Beattie's favor the remarks, 409 U.S. at 331, 93 S.Ct. at 617, that "To tie the privilege

---

**15.** Such sanctums exist by virtue of the relationships they protect, not the other way round. They do not constitute "free zones" around the person of the accused so that he may send out messages to retrieve incriminating documents or ask co-conspirators to hurry damaging materials into the hands of the most-likely-to-be-indicted.

against self-incrimination to a concept of ownership would be to draw a meaningless line" since

> It would hold here that the business records which petitioner actually owned would be protected in the hands of her accountant, while business information communicated to her accountant by letter and conversations in which the accountant took notes, in addition to the accountant's own workpapers and photocopies of petitioner's records, would not be subject to a claim of privilege since title rested in the accountant.

This does not mean to us that the Court was ruling that an accountant's workpapers would be privileged if in the taxpayer's possession; it meant only that the taxpayer's ownership of her business records did not allow her to claim any more privilege for them when they were in the accountant's possession than she could for the accountant's own workpapers. We agree, of course, that what is material is not the ownership of the papers but their nature; we do not think it would matter whether Robeson passed title to Beattie or not.

Turning to the other side, while *Couch* obviously did not decide the question here at issue in the Government's favor we should not overlook passages in the opinion which point in that direction. The two most notable are, 409 U.S. at 335–36, 93 S.Ct. at 619:

> Petitioner seeks extensions of constitutional protections against self-incrimination in the very situation where obligations of disclosure exist and under a system largely dependent upon honest self-reporting even to survive. Accordingly, petitioner here cannot reasonably claim, either for Fourth or Fifth Amendment purposes, an expectation of protected privacy or confidentiality.

and, 409 U.S. at 336, 93 S.Ct. at 620:

> It is important, in applying constitutional principles, to interpret them in light of the fundamental interests of personal liberty they were meant to serve. Respect for these principles is eroded when they leap their proper bounds to interfere with the legitimate interest of society in enforcement of its laws and collection of the revenues.

The taxpayer urges that however all this might stand if we looked only at the test of the *Couch* opinion, a decision in his favor is mandated by footnote 12. This was appended to a sentence commenting on Mrs. Couch's reliance on the *Boyd* case. Mr. Justice Powell first said that *Boyd* "did not, however, address or contemplate the divergence of ownership and possession," citing in footnote the statement in *United States v. White, supra,* 322 U.S. at 699, 64 S.Ct. 1248, that "the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity." He then continued, "and petitioner concedes that court decisions applying *Boyd* have largely been in instances where possession and ownership conjoined, [citing in a footnote Brief for Petitioner 13–14] see, e. g., *Hill v. Philpott,* 445 F.2d 114 (CA 7, 1971); *United States v. Judson,* 322 F.2d 460, 63–3 USTC ¶ 9658 (CA 9 1963)". To this list was appended footnote 12, which reads:

> See also *United States v. Cohen,* 388 F.2d 464, 468 (CA 9 1967), where the court, in upholding the right of a possessor, nonowner, to assert the privilege, noted that "it is possession of papers sought by the government, not ownership, which sets the stage for exercise of the governmental compulsion which it is the purpose of the privilege to prohibit." Though the instant case concerns the scope of the privilege for an owner, nonpossessor, the Ninth Circuit's linkage of possession to the purposes served by the privilege was appropriate.

We do not, of course, decide what qualifies as rightful possession enabling the possessor to assert the privilege.

It is undisputed that *United States v. Cohen* is on all fours with this case and was decided in favor of the taxpayer.

We think the footnote, which came as part of a rejection of Mrs. Couch's argument and not of the Government's, was intended simply as another reaffirmation of the Court's position that ownership unaccompanied by possession was insufficient to trigger the privilege and was not a blanket endorsement of the Ninth Circuit's decision in *Cohen* contrary to the Court's later observation that it declined "to conjecture broadly on the significance of possession in cases and circumstances not before this Court." 409 U.S. at 336 n. 20, 93 S.Ct. at 620. This conclusion is fortified by the apparent derivation of the footnote, which we outline in the margin,[16] and by the consideration that the Court could hardly have meant to approve a decision on an issue important to the administration of the federal revenue laws which was not before it and which was contrary to decisions of other courts of appeals in cases not cited to it.[17]

## IV.

■■ We thus hold that an accountant's workpapers representing his independent work product, as distinguished from mere copies of a taxpayer's records, see note 2 supra, do not come within the privilege simply because the taxpayer possesses them with the accountant's consent or even has acquired title to them. As Justice Holmes wrote, "The right not to be compelled to be a witness against oneself is not a right to appropriate property that may tell one's story." *Matter of Harris,* 221 U.S. at 279–80, 31 S.Ct. at 558, supra.

In so holding we have not overlooked that the paper held privileged in *Boyd* was not of the accused's own creation but was an invoice [18] from an English

---

**16.** Petitioner's brief in *Couch* had stated, pp. 13–14:

> The courts have frequently prevented the use of a man's own papers against him in a series of cases since *Boyd v. U. S.* (supra), although in most of these instances possession and ownership have remained simultaneous, for example, *U. S. v. Cohen,* 388 F.2d 464, 68–1 USTC 9140 (CA 9 1967), *U. S. v. Judson,* 63–2 USTC 9658 (CA 9 1963) *Hill v. Philpott,* 445 F.2d 144, 71–1 USTC 9415 (CA 7 1971).

Unhappily this was riddled with error. In *Judson* there was ownership and not possession, and the decision is wrong in light of *Couch* unless it matters that in *Judson* the papers, although unprotected by the attorney-client privilege, 322 F.2d at 463, were in the possession of a lawyer rather than an accountant. In *Hill v. Philpott* there was a conjunction of ownership and possession; the question was not whether the records would have been protected against subpoena, as all conceded, but whether they were also protected against seizure pursuant to a search warrant. In contrast to *Judson* which involved ownership but not possession and ran counter to what was to be the holding in *Couch,* and *Hill v. Philpott* which involved both and was not truly relevant, *Cohen* involved possession but not ownership. Recognizing this, Mr. Justice Powell separated *Cohen* as the only one of the three cases that supported rejection of Mrs. Couch's contention that ownership alone was enough.

**17.** *Deck v. United States,* 119 U.S.App.D.C. 240, 339 F.2d 739 (1964), cert. denied, 379 U.S. 967, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965) (Prettyman, *J.*) (possibly although probably not distinguishable in that accountant had requested return of workpapers); *United States v. Widelski,* 452 F.2d 1 (6 Cir. 1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972) (expressly declining to follow *Cohen* ). In *United States v. Egenberg,* 443 F.2d 512 (3 Cir. 1971), where the court denied a claim of privilege by an accountant who was the subject of an investigation by special agents with respect to records of clients which were in his possession, the court, after saying that its conclusion was "not at variance with the holding of *United States v. Cohen,* 388 F.2d 464 (9 Cir. 1967), on which the district court relied," went on to state, 443 F.2d at 518:

> There is language in *Cohen* suggesting that mere possession of third party papers is enough to bring those papers within the witness' privilege. That language is inconsistent with the holdings of the Supreme Court and the reasoning of the opinion is unpersuasive.

There was no occasion for the Government to debate the correctness of *Cohen* or to cite the Court of Appeals decisions contrary to it since that issue was not before the Court in *Couch.*

**18.** The Boyds had contracted with the United States government to supply imported plate glass subject to an exemption from duty.

manufacturer covering the defendants' importation of plate glass. That fact indeed would destroy any theory that the privilege is limited to papers of the accused's own creation. But we are proceeding on no such theory. It would indeed be a crabbed reading of the privilege to hold that it applies to copies of letters written by an accused but not to letters written to him in response; the latter, if in the possession of the accused, are within the protected "private inner sanctum" as much as the former, see *Wilson v. United States,* supra, 221 U.S. at 378, 31 S.Ct. 538. Insofar as the summons requests copies of any communications between Beattie and Robeson, it should not be enforced, and we modify the order to so provide. But there is no such invasion of a private inner sanctum when a taxpayer is asked to produce the work product of an independent contractor, possession of which he has obtained in an effort to forestall the compulsory production the Government could have had if the contractor had retained them.[19] *Boyd* was not a case where buyer had persuaded a seller to turn over the seller's own records.

It is fundamental to the *Boyd* decision that by producing the invoice, the Boyds would have admitted the fact, crucial to their prosecution, that they had received it; indeed they were placed in a peculiarly uncomfortable position by the provision in the applicable statute, see 116 U.S. at 620, 6 S.Ct. at 527, that "if the defendant or claimant shall fail or refuse to produce such book, invoice, or paper in obedience to such notice, the allegations stated in the said motion

shall be taken as confessed, unless his failure or refusal to produce the same shall be explained to the satisfaction of the court." Beattie is not being asked to admit anything by producing Robeson's workpapers except the fact, inconsequential to any prosecution, that he received them long after the income tax returns were filed. Another consideration, already noted, shows how widely the two cases differ. In order to impeach or explain the foreign invoice after its introduction into evidence, the Boyds would have had to testify themselves and abandon the right of silence, which the privilege confers. This would be the case also with a personal letter received from another. But documents and records compiled by third persons for their own use cannot be introduced unless the prosecution calls their author or some other witness who can authenticate and explain them. The privilege no more protects Beattie against such testimony than it would have protected the Boyds against testimony by the English seller.

### V.

Little need be said of the taxpayer's only other argument, namely, that enforcement of the summons would violate IRS News Release IR–949 (1968), in which the Service announced that in a criminal noncustody investigation a taxpayer would be advised, *inter alia,* "that he cannot be compelled to incriminate himself by answering questions or producing documents . . .." Not disputing that he was so advised, Beattie says the warning would be a hollow gesture if production of documents can in

They claimed that they had met the contract out of inventory already on hand and were therefore entitled to a duty-free import of an equivalent amount. They had previously gained the free entry of 29 cases of plate glass and they contended that this shipment replaced only a part of that supplied to the government. The government asserted that the shipment had more than met the amount furnished. After the Boyds had secured another free entry permit for 35 cases of plate glass, and this shipment had arrived in America, but before its delivery, the goods were impounded and the permit revoked. In the proceedings for the forfeiture of the 35 cases, the government, pursuant to the statutory proce-

dure held unconstitutional by the Court, sought production of the invoice for the first shipment of the 29 cases.

19. In *Deck, supra,* note 17, 339 F.2d at 740, Judge Prettyman stressed that "[i]t was not until after the tax investigation began that [the taxpayer] showed any interest in the workpapers then in the possession of [the accountant] until [the taxpayer] requested them [they] were apparently regarded by all concerned as his property." This was quoted in *United States v. Zakutansky,* 401 F.2d 68 (7th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565.

fact be compelled. Apart from other questions concerning the effect of a violation of the News Release which need not detain us here, the short answer is that the warning was to be coterminous with the constitutional privilege. If, as we hold, compulsory production of the accountant's workpapers does not violate the privilege, it is not inconsistent with the warning.

The order enforcing the summons is affirmed, subject to the limitations set forth in this opinion. Since it seems likely that the taxpayer will desire to take the matter higher, we will extend the stay for fourteen days from the entry of this judgment and, if within that period, the taxpayer applies to the Supreme Court of the United States for a further stay pending a petition for certiorari, until the disposition of such an application.