# JAMES H. GARNER *v.* JON H. GARNER

[No. 1254, September Term, 1975.]

*Decided June 7, 1976.*

The cause was argued before MORTON, GILBERT and LOWE,
JJ.

*James L. Sherbin* for appellant.

*Thomas B. Dabney, Jr.,* for appellee.

GILBERT, J., delivered the opinion of the Court.

On January 13, 1975, Jon H. Garner (Jon) sued his brother, James H. Garner (James), in the Circuit Court for Garrett County in assumpsit. The suit alleged that Jon had loaned James the sum of $6,910, but, despite demand for repayment, James refused to repay the monies. The declaration, on its face, recited that all the sums loaned by Jon to James had been turned over to James no later than August, 1971.

James responded to Jon's averments, by raising the applicable general plea, a special plea of limitations and a further special plea that the brothers " . . . were engaged in a partnership . . . from June, 1971, until September, 1974, and that one partner may not sue another partner in a Court of Law."

At a non-jury trial before Judge Stuart F. Hamill, Jon prevailed in his claim and judgment was entered against James in the amount of $6,910.

James has appealed, and he attacks the judgment asserting that the trial judge erred because (1) the evidence established the existence of a partnership between the two litigating brothers, and (2) alternatively, that if there were no partnership then the Statute of Limitations was a complete bar to recovery. For the reasons stated *infra,* we think James to be wrong on both issues, and we shall, therefore, affirm the judgment of the circuit court.

The record shows that prior to 1971, James had established himself as an electrical contractor in Garrett County. Sometime in the early part of 1971, James had conversations with his brother, Jon, a plumber, concerning the creation of a partnership. According to Jon, he was to contribute $8,000 to the venture in exchange for an 8% interest in the business. There was, however, a condition precedent that the brothers would work together for a while

before finalizing the partnership, apparently in order to see how the two would get along. Jon, believing that he could demand and get the return of his money at any time before the actual creation of the partnership, advanced to James $1,506.47 on or about May 29, 1971, $4,000 on June 12, 1971, and $1,403.53 on August 4, 1971. In addition, Jon transferred ownership of a truck to James, thus completing the payment of $8,000.

The business was then operated as "Garner and Garner Electrical and Plumbing Contractors." All trader's licenses were in James's name. A back-hoe was purchased by James, although Jon, his wife, and James's wife were all required to endorse a security instrument so as to assure repayment to the bank that had advanced the purchase price for the back-hoe. No partnership tax return was ever filed, and during the time in question, Jon was carried on the books as an employee of James or as a subcontractor. An Internal Revenue Service Form W-2 for 1972 clearly showed that Jon was employed by James during that year and was paid $7,594.38 in wages.

Each Garner wrote an agreement of partnership in his own hand. Neither, however, signed the "agreement" he had written or that written by his brother.[1] The agreements are

---

1. The "agreement" penned by Jon provided:

"I, Jon H. Garner, hereby enter into an agreement with my Brother, James H. Garner, concerning my investment in his company know [sic] as Garner Electrical Enterprises. [sic].

The Future name shall be Garner & Garner Electrical & Plumbing Contractors.

My investment into the company shall be one 1966 Chev. Pick up truck and 7,100 in Legal money, also some supplies & tools.

For this investment I will have 8% interest in G & G and my brother shall have 92% interest in G & G.

For this 92% interest he shall leave in the company one 1968 Chevy, two trucks, one 1961 international and one 1966 chevy panel, Accounts Rec, Accounts Payable, Notes Due Bank and money in Checking Accounts, Tools & supplies.

My brother shall be held financial[ly] respondable [sic] for his interest in the Company.

My brother has exclusive rights to purchase the Total stock held by me within one year after my Death, at 1,000 Dollars per per [sic] cent from my airs [sic] if all of the stock cannot be purchased

undated, but there was testimony that they were written in late 1971 or early 1972. A formal partnership agreement was drafted and it was signed by Jon in 1973.[2] James did not sign the agreement.

James testified that he considered his brother and himself partners. He explained that for tax reasons no partnership return was filed, and his brother was carried as an employee or, sometimes, as a subcontractor. James pointed to the firm name and its listing in the telephone book as evidence of the partnership's existence.

Judge Hamill found the existence of a condition precedent to the creation of the partnership, and that there had been no fulfillment of the condition. Consequently, he ruled that a partnership never existed. The judge further

---

within one year by my brother he may buy as much as possibly [sic] as long as the remaining amount of stock is purchased at the same time by a party of whom my brother agrees.

I may purchase additional stock from my brother for 1,000 Dollars per share up to 49% of the stock in the company.

The "agreement" prepared by James stated:

I James Garner, hereby enter into an agreement with my brother Jon concerning my buisness [sic] holdings in Garner Electrical Enterprises.

The future name shall be Garner & Garner Electrical & Plumbing Contractors.

My holdings consist of one car 1968 Chevy, two trucks, 1961 international 1 1966 Chevy Panel, stock accounts rec, account payable, notes due banks, (SPOC) and money in checking accounts and all tools owned by me.

W[h]ere as upon my death my brother has within a year the first right to purchace [sic] total stock hold [sic] by me or my airs [sic] at above agreed price. If all of the stock cannot be brought he may buy as much as able [sic] as long as remainder is purchased by others at the same time and with my brothers [sic] agreement.

My brother agrees to invest $7,100 in real money and 1 1966 Chevy pickup, some supplies and tools.

For the above investment he will have 8% interest in G & G.

Future interest can be bought up to 49% total at 1000.00 per 1%. Cash paid to myself or my heirs.

My brother is to be hold [sic] financially respon- [sic] for his percentage.

2. The testimony indicates that both brothers went to an attorney, described the business arrangement they were seeking and had the formal agreement drafted. James testified that the document accurately includes the terms both brothers had agreed upon.

found that the monies were advanced by Jon to James subject to the condition, and they must be considered as a loan. The judge said that the loan was ". . . predicated on the future formation of a partnership which was not consummated because of the conduct of James." Implicitly, the judge held that limitations did not begin to run against Jon until James's declination to enter into a partnership became manifest.

James asserts that "[t]he business was advertised as Garner and Garner in the phone directory . . . ", on letterheads, and it appeared on insurance policies. This, he contends, is evidence that "[t]he parties conducted themselves as if they were a partnership and that was their intention."

James's argument would have validity if we were here dealing with a third party's claim against an ostensible partnership rather than a suit between the two brothers, one seeking to show a partnership and the other denying its existence. In *Myers v. Aragona*, 21 Md. App. 45, 318 A. 2d 263 (1974), we discussed the use of a firm name on letterheads as suggesting to a third party that a partnership existed. We determined that such evidence was sufficient to create a partnership by estoppel. 21 Md. App. at 55. *See also McBriety v. Phillips*, 180 Md. 569, 26 A. 2d 400 (1942); *Blaustein v. Oldfield*, 135 Md. 162, 108 A. 485 (1919); Md. Ann. Code, Corporations and Associations Art. § 9-308.

The case *sub judice*, however, is not between third persons and a purported partnership, but rather between two parties advancing opposite views as to whether a partnership between them existed. As between the parties, a partnership is a matter of intention proven by their expressed agreement or inferred from either person's actions or conduct. *M. Lit, Inc. v. Berger*, 225 Md. 241, 170 A. 2d 303 (1961); *Cohen v. Orlove*, 190 Md. 237, 57 A. 2d 810 (1948); *Morgart v. Smouse*, 103 Md. 463, 63 A. 1070 (1906). The burden of proving the existence of a partnership rests upon the party alleging it. *M. Lit, Inc. v. Berger, supra; Miller v. Salabes*, 225 Md. 53, 169 A. 2d 671 (1961); *Beard v. Beard*, 185 Md. 178, 44 A. 2d

469 (1945); *Collier v. Collier*, 182 Md. 82, 32 A. 2d 469 (1943); *McBriety v. Phillips, supra.*

At the time the Garner brothers commenced doing business together, whether as employee-employer, contractor-subcontractor, or partners, the partnership law of Maryland was codified in Md. Ann. Code art. 73A.[3] Article 73A, § 6 (1), defined a partnership as:

> " . . . [A]n association of two or more persons to carry on as co-owners a business for profit."[4]

The Uniform Act established specified rules to be used in ascertaining the existence, *vel non*, of a partnership. Md. Ann. Code art. 73A, § 7, then provided:

> "In determining whether a partnership exists, these rules shall apply:
>
> (1) Except as provided by § 16 persons who are not partners as to each other are not partners as to third persons.[5]
>
> (2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
>
> (3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
>
> (4) The receipt by a person of a share of the

---

**3.** Article 73A was titled as "The Uniform Partnership Act." The Uniform Act was originally adopted in this State by Laws 1916, ch. 175, § 1. The updating and recodification of the Maryland Code has resulted in the Uniform Act's now appearing in Md. Ann. Code, Corporations and Associations Art., Title 9.

**4.** The same definition now appears in Corporations and Associations Art. § 9-101 (f).

**5.** Former § 16 dealt with a partnership by estoppel. The same section, with minor changes none of which are substantive, now appears as Corporations and Associations Art. § 9-308.

profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As a debt by installments or otherwise,

(b) As wages of an employee or rent to a landlord,

(c) As an annuity to a widow or representative of a deceased partner,

(d) As interest on a loan, though the amount of payment vary with the profits of the business,

(e) As the consideration for the sale of the good will of a business or other property by installments or otherwise." [6]

The Court of Appeals has held that a written agreement is not necessary in order to create a partnership. *Gosman v. Gosman*, 271 Md. 514, 318 A. 2d 821 (1974), *rev'g in part and aff'g in part* 19 Md. App. 66, 309 A. 2d 34 (1973); *Presutti v. Presutti*, 270 Md. 193, 310 A. 2d 791 (1973), *M. Lit, Inc. v. Berger, supra.* A similar conclusion was reached by Judge Winter in *In re Hare*, 205 F. Supp. 881, 884-85 (D. Md. 1962). This principle applies whether we speak of a partnership *inter sese* or a partnership as to third parties which, as we have seen, arises by operation of law. *Waring v. National Marine Bank*, 74 Md. 278, 22 A. 140 (1891); *Bull v. Schuberth*, 2 Md. 38 (1852); *Myers v. Aragona, supra.*

A partnership *inter sese* cannot exist against the consent and intention of the parties, and their intention must be gleaned from proof in the case. *Southern Can Co. v. Sayler*, 152 Md. 303, 136 A. 624 (1927); *Waring v. National Marine Bank, supra.*

---

**6.** Former § 7 now appears as Corporations and Associations Art., § 9-201. According to the § 9-201 Revisor's Note, the term "surviving spouse" was substituted for the word "widow" in paragraph (4) (iii) and the conjunction "or" was added to the paragraph (4) (iv) after the semicolon. The article "the" was substituted for the adjective "such" in paragraph (2) after "whether" and before "co-owners"; it was also substituted for "such" ir paragraph (4) after "if" and before "profits." The Revisor declares that "[t]he only other changes are technical changes in punctuation."

The Court in *Southern Can Co. v. Sayler, supra,* discussed in depth the various tests that have been applied by courts in order to determine the existence or non-existence of a partnership, noting that the test most often applied in Maryland in cases arising out of a dispute between parties alleged to be partners is the intention of the parties. The test of intention, the Court opined, " . . . logically should be given great weight." 152 Md. at 316.

After the conclusion of the testimony and argument of counsel in the case now before us, Judge Hamill stated:

> "In this case, we have a certain written agreement of the parties, I don't believe either one of them are signed, but it's their individual writings and they both admit that this was their own writing . . . . This agreement is certainly in itself too vague and too inconclusive to form a partnership. While the operations of these two individuals has some attributes of a partnership, I'm of the opinion that it is just entirely too vague and inconclusive for the court to construe this to be a partnership. Now, there is no doubt in my mind that they intended to form a partnership, and they worked together towards that end, but I do not believe that the partnership was ever con-summated, and I believe it was the conduct of the defendant that prevented the formation of that partnership. The paradox of this case is that the defendant relies upon the formation of a partnership between himself and his brother, Jon, as a defense to Jon's claim, but yet it was he, James, who was most responsible for the prevention of the formation of that partnership. In fact, it was he who refused, or at least never signed, the formal Articles of Partnership that were prepared . . . although . . . they were signed by Jon in November of 1973. Now, a partnership, like any other contract, requires mutuality, a meeting of the minds and agreement, and it requires

definite terms and specific intent among other things . . . . But the evidence in this case clearly indicates that James did not wish to consummate this partnership agreement.

From the evidence and testimony that I've heard and seen in this case, I am of the opinion that James kept control of this business, and also took title to both real and personal property in his own individual name, as well as trader's licenses and so forth.

. . . [T]he evidence is totally inconsistent with the formation of a partnership, primarily, as I've said, because of the conduct of the defendant. There was no partnership trader's license, and there was no partnership income tax returns ever filed. There was no formal partnership agreement ever executed, although it was contemplated by the parties and executed by Jon, it was not executed by James, who apparently refused, because at this time, according to the testimony, he decided he didn't want to consummate this partnership with his brother, Jon. He had some opinion about his [Jon's] drinking habits or something to that effect, although, . . . that testimony was very inconclusive as to . . . [Jon's] drinking habits. There is no land, buildings, equipment, tools or personal property of any sort ever purchased in the partnership name. No bank accounts in the partnership name. And in 1972, . . . Jon was considered an employee and received a W-2 form showing his wages that he received as an employee."

Based upon the evidence presented to him, Judge Hamill was unable to find the existence of a partnership notwithstanding that at one time there was an intent to form a partnership. The judge observed that James apparently had a change of mind and departed from the scheme. A reading of the above quoted portion of Judge Hamill's oral opinion manifests that the judge applied the

applicable law as to a partnership *inter sese* and concluded that no partnership, in fact, existed. We are unable to state that his judgment on the evidence was clearly erroneous. Md. Rule 1086. Patently, James did not meet his burden of proving the existence of a partnership. *M. Lit, Inc. v. Berger, supra.*

With respect to the plea of limitations that James entered in defense to Jon's claim, the trial judge brushed it aside because he considered the $6,910 which had been advanced by Jon to James, as " . . . a loan predicated on the future formation of a partnership which was not consummated because of the conduct of James."

Courts and Judicial Proceedings Art. § 5-101 provides:

> "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

I H.G. Wood, *A Treatise on the Limitations of Actions* § 119, at 629-30 (1916), speaking of a right of action accruing upon the happening of a future contingency, states:

> " . . . Whenever the contract of the defendant is not absolute in the first instance, because of something to be done by the plaintiff or some third person as a condition precedent, the cause of action does not arise until the condition has been accomplished or the precedent act performed." (Footnote omitted).

*See Washington, Baltimore and Annapolis Elec. R.R. v. Moss,* 130 Md. 198, 204-05, 100 A. 86, 89 (1917); *Ponce v. McElvy,* 47 Cal. 154 (1873). *See also Whipple v. Blackington,* 97 Mass. 476 (1867).

While the above quoted text is addressed to acts to be performed by a plaintiff and third person, it applies with equal effect to situations where a defendant was to do something as a condition precedent. A defendant, in a case such as that now before us, cannot fail to perform the

condition precedent and successfully interpose the defense of limitations because the Statute of Limitations would not commence to run until the condition precedent had been satisfied. Since Jon filed suit on January 13, 1975, his claim would be barred only if the cause of action accrued prior to January 14, 1972. An examination of the evidence discloses that the handwritten agreements were drafted in late 1971 or early 1972. Jon worked for his brother in some capacity throughout 1972, and Jon signed the formal drafted agreement in 1973. Such evidence indicates, at the very least, that during 1972, the brothers worked amicably together and, implicitly, it had not yet become clear to Jon that no partnership would be formed. The judge could have inferred from the recited and other evidence in the case that the cause of action accrued subsequent to January 12, 1972, and, consequently, within the three-year Statute of Limitations.

We depart from the holding in this case to explain why we shall require the appellee to pay the costs of his own brief notwithstanding the customary practice of assessing costs against the nonprevailing party.

Appellee did not file his brief until the "eleventh hour," *i.e.*, literally minutes before scheduled oral argument. Appellant courteously interposed no objection to appellee's tardiness, and the Court permitted the brief to be filed and counsel heard. Md. Rule 1030 e. We shall, however, as a sanction for the belated filing of the appellee's brief, exercise the discretion vested in us by Md. Rule 1082 a and assess the costs of the appellee's brief against the appellee.

> *Judgment affirmed.*
> *Costs, except appellee's brief, to be paid by appellant.*
> *Appellee to pay costs of his own brief.*