**In the Matter of SPECIAL GRAND JURY NO. 1, IMPANELLED DECEMBER, 1977 TERM.**

Civ. No. K–78–1220.

United States District Court,
D. Maryland.

Aug. 31, 1978.

Harold Buchman and Barbara B. Mello, Baltimore, Md., for petitioner.

Russell T. Baker, Jr., U. S. Atty. and Herbert Better and Richard D. Bennett, Asst. U. S. Attys., Baltimore, Md., for Government.

FRANK A. KAUFMAN, District Judge.

On June 29, 1978, a Special Grand Jury of this Court issued a subpoena duces tecum to the "Custodian of Records" X and X [1] requiring production of—

any and all records, books and documents for the period 1/1/72 through 12/31/75 that are described below: 1. All ledgers and journals; 2. All bank statements, checks, cancelled or otherwise, check vouchers, check stubs, checkbooks, deposit tickets, savings account books for escrow accounts and any and all other checking and savings bank accounts; 3. Any and all settlement sheets and other records of settlements involving clients who were represented in connection with claims for bodily injuries arising out of automobile accidents.[2]

The Government takes the position that the within Petitioner, the older of the two brothers, is the "Custodian of Records" of X and X and is seeking herein compliance with the grand jury subpoena by him only and not by his younger brother. The older brother has moved to quash the subpoena, asserting his Fifth Amendment privilege against self-incrimination. The Government, opposing that motion, asks this Court to require the said older brother X to comply with the grand jury subpoena.

Based upon the record in this case including testimony taken during a hearing on

Following protracted proceedings before this Court in the aforementioned two 1976 cases and also in Civil Nos. K–76–1261 and K–76–1263 involving other attorneys, in the course of which the Government acknowledged that X and X were targets of investigation by the grand jury in connection with alleged fraudulent claims against and alleged fraudulent settlements with insurance companies, the subpoenas in all four cases were withdrawn. The records in those four cases and in the within case have been sealed by order of this Court consented to by respective counsel. Counsel herein have also agreed that the records in the four 1976 cases are part of the record in the within case.

Petitioner seeks, on grounds independent of his assertion of his Fifth Amendment privilege, to quash the subpoena based upon the lapse of time since 1976 and the stress and prejudice to which he is being presently subjected by the rekindling of the 1976 efforts to obtain his books and records. After hearing from counsel for the Government, with the consent of Petitioner, on the record, *ex parte, in camera,* this Court concludes that, even if a motion prior to indictment, objecting to pre-indictment delays, is timely, the Government in this case would not seem to have violated minimal constitutional standards, *see United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Alderman,* 423 F.Supp. 847 (D.Md.1976); and would appear to have valid reasons for the time sequences relating to its investigation of the within petitioner. That conclusion is stated at this time without prejudice to post-indictment reconsideration if Petitioner is in fact indicted.

---

1. X [1] and X,[2] brothers, are respectively the two X's each of whose last name is one-half of the name of what the Government contends is a law partnership the name of which is composed of the last names of the two X's as partners. The real name is not used herein.

2. In 1976, separate grand jury subpoenas were issued to each of the brothers X as "Custodian of Records, Law Offices of X and X." *See* Civil Nos. K–76–1265 and K–76–1266. Therein the Grand Jury sought—

any and all files, documents (including but not limited to correspondence, memoranda and/or notes) or records in your actual or constructive possession relative to any claim for personal injury arising out of an automobile accident on which payment, full or partial, has been made by an insurance company between September 1, 1971 and June 30, 1976.
and
any and all records, books and documents, for the period September 1, 1971 to the present, in your actual or constructive possession, that are described below:
1. All ledgers and journals;
2. All bank statements, checks, cancelled or otherwise, check vouchers, check stubs, check books deposit tickets, savings account books, for escrow account and any and all other checking and savings bank accounts.
The 1976 subpoenas were much broader than the subpoena in the within case. Those 1976 subpoenas sought, *inter alia,* client files, thus raising attorney-client privilege questions not presented herein. In this case, only Fifth Amendment self-incrimination issues are posed.

August 27, 1976, this Court finds the following facts: [3]

(1) The brothers practiced law continuously from November, 1968, to June 29, 1978, when the subpoena involved herein was issued to the older brother, in the same suite on the door of which appeared their individual names. The directory board on the entrance floor of the building in which that office is located also lists only their individual names and not the firm name. (Tr. 102–03, 18 *et seq.* and Exhibits 2 and 3, the latter being photographs referred thereat).

(2) The brothers used stationery and professional cards and filed in one or more courts documents bearing the name of "X and X." However, while the stationery and calling cards used by both brothers carried the name of "X and X," the respective card and the respective stationery of each brother set forth the telephone number of that brother only. Each brother had his own telephone number and separate telephone listing, and paid his own telephone bill. There was seemingly no firm telephone listing. (Tr. 32–35, 44–47, 83–85, 91, 115).

(3) Letters and hospital bills were addressed and checks were made payable to "X and X." (Tr. 58–59, 87–89).

(4) Letters were addressed by one or both brothers to insurance companies referring to the "office" having been retained by personal injury claimants. (Tr. 85–86).

(5) The brothers would sometimes handle each other's cases although the older brother seldom handled the younger brother's cases and received no compensation for so doing when he so did. (Tr. 37, 54, 70–71).

(6) The brothers kept separate books and financial records and paid their own expenses although the older brother paid most of the costs of operation of the office the brothers shared. (*See, e. g.,* 42–43, 56, 105).

(7) The older brother paid for the rental of the law office and signed the written lease document as the sole lessee. The younger brother apparently contributed toward the monthly rent on only two occasions. (Tr. 21–22, 44).

(8) There was seemingly no partnership agreement, written or oral. (*See, e. g.,* Tr. 44, 85).

(9) Each brother had access to the case files of the other but not to the books of the other; and neither was required to account to the other. (Tr. 56–57, 69, 105, 110).

(10) The brothers sometimes worked or consulted together with regard to cases. (Tr. 79–71).

(11) The brothers filed separate federal and state income tax returns, did not file any partnership tax returns, maintained separate bank accounts, did not maintain any joint bank account either under the name of X and X or otherwise, and did not share profits. (Tr. 40–41, 54, 56–57, 106, 116).

(12) The older brother shared with the younger brother fees paid by clients of the older brother and resulting from work in cases upon which the younger brother did work for the older brother. The older brother seemingly decided what amounts to pay to the younger brother. (Tr. 37–40).

(13) The older brother employed and paid two or three part-time secretaries and reported and paid social security and withholding taxes with regard to them. The secretaries did work for both brothers and had access to their records. (Tr. 40–41, 71).

(14) The older brother provided office space, within the suite of offices shared by the brothers X, to two other attorneys, one of whom was a cousin of the brothers X. Those two attorneys each had other full-time jobs and sometimes worked part-time in the suite occupied by the brothers X. On an occasional basis, one or the other or both

---

**3.** Both the Government and counsel for the alleged Custodian of Records have stated they do not desire to adduce any further evidence and that they stand or fall upon the existing record. All "Tr." references are to the proceeding on August 27, 1976.

Herein, this Court assumes that the relevant and material facts were the same on June 29, 1978, the date the grand jury subpoena involved in this case was issued, as on August 27, 1976.

of the two attorneys did work for the older brother on the older brother's cases. The record does not disclose what rent, if any, the other two attorneys paid. (Tr. 27, 43, 64, 72–74).

(15) Most of the office equipment and furniture was purchased by the older brother. There was no jointly owned property nor any jointly owned records or documents. (Tr. 57, 105).

(16) The older brother worked much harder than the younger brother. The latter was apparently not interested in pushing himself. One of the principal reasons the older brother held himself out as a partner of his younger brother was to please their parents. The older brother listened to his brother's suggestions, but he (the older brother) managed the office, made the decisions, and controlled his own practice. (Tr. 47–48, 53, 57–58, 110).

(17) The older brother had no arrangement with his brother or anyone else concerning succession to his practice. The older brother is married. (Tr. 43, 85).

(18) The Grand Jury involved in this case is investigating allegations that certain attorneys in Maryland have conspired with their own clients and with physicians, examining and treating those clients, to inflate and falsify alleged personal injuries of those clients and to defraud liability insurance companies who had issued policies to persons alleged to have tortiously injured those clients by obtaining settlements based on such inflated, false doctors' reports and evaluations.

The Government seeks to require the older brother to comply with the grand jury subpoena. The older brother seeks to quash that subpoena.

Two legal issues are present in this case: (1) whether the records sought are partnership records; and (2) whether the types of records involved may be withheld by the older brother pursuant to his assertion of his Fifth Amendment privilege against self-incrimination.

**4.** Those decisions include *United States v. White,* 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). They,

I

"It has long been established, of course, that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony. * * * The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life." *Bellis v. United States,* 417 U.S. 85, 87–88, 94 S.Ct. 2179, 2182–2813, 40 L.Ed.2d 678 (1974). However, an attorney may not claim the privilege if he has incorporated his practice, *Reamer v. Beall,* 506 F.2d 1345 (4th Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 431 (1975); *see Bellis, supra,* 417 U.S. at 100, 94 S.Ct. 2179. That is because "an individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." *Id.* at 88, 94 S.Ct. at 2183. The decisions of the Supreme Court preceding *Bellis*[4] "reflect the Court's consistent view that the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records.' *United States v. White,* supra, [322 U.S.] at 701 [64 S.Ct. 1248]." *Bellis v. United States, supra* at 89–90, 94 S.Ct. at 2184. Accordingly, the "organizational records held in a representative capacity" by someone acting on behalf of "an organized collective entity" which itself is an "independent entity [existing] apart from its individual members" and which itself is "relatively well organized and structured, and not merely a loose, informal association of individuals," are not subject to the claim of the privilege. *Id.* at 92–93, 94 S.Ct. at 2185.

and other decisions of the Supreme Court, are reviewed by Mr. Justice Marshall in *Bellis, supra* 417 U.S. at 88–89, 94 S.Ct. 2179.

In *Bellis*, Mr. Justice Marshall held that a "modest size" (417 U.S. at 94, 94 S.Ct. 2179) law partnership was such an entity. The law firm in *Bellis* was composed of three partners, had about six employees (two attorney associates; three secretaries and a receptionist) and had existed about 15 years. *Id.* at 85–86, 94 S.Ct. 2179. It is not clear as to whether there was a formal partnership agreement. *Id.* at 96 n. 4, 94 S.Ct. 2179. The partners seemingly were not related by blood or marriage. Mr. Justice Marshall held that "[w]hile small, the partnership here did have an established institutional identity independent of its individual partners. This was not an informal association or a temporary arrangement for the undertaking of a few projects of short-lived duration." *Id.* at 95, 94 S.Ct. at 2186. In so concluding, the Justice noted the existence of a partnership bank account, stationery with a firm letterhead, the fact that the partners filed federal tax returns, and the fact that the partners held out to third parties that a partnership was in existence. *Id.* at 96–97, 94 S.Ct. 2179. He also stressed that the subpoenaed records were held in "a representative capacity" and were "partnership property" under applicable state (Pennsylvania) law. *Id.* at 97–98, 94 S.Ct. 2179.

■ Whether a partnership exists in a given case depends upon applicable state law. *Id.* at 96–97, 94 S.Ct. 2179. In *Bellis*, the state therein involved (Pennsylvania) had enacted the Uniform Partnership Act. The same is true of Maryland whose law is applicable herein. Under that Act, a person who holds himself out as a partner of another may be liable to others by estoppel if such others with whom he has dealt have relied on such representation, even if no partnership existed.[5] That does not mean, however, that, in a case such as this one, in which the Government has shown no reliance on any representation of either or both of the two X's, either brother X is estopped *per se* from asserting his Fifth Amendment privilege. That is true even if, as this Court assumes to be the case, each of the brothers X is a "partner by estoppel" within the meaning of the Maryland statute,[6] since the existence of a partnership by estoppel was only one of many reasons why Mr. Justice Marshall concluded in *Bellis* that the partnership there involved was "relatively well organized and structured, and not merely a loose, informal association of individuals." *Id.* 417 U.S. at 92–93, 94 S.Ct. at 2185.

■ The brothers X have led their clients, insurance companies and the public generally to believe they were partners. They have so styled themselves on their stationery and cards. They have done so on a continuous basis for nine years. But they have maintained no partnership bank account, filed no partnership tax returns, owned no property jointly, have not divided or shared profits, and have not had access to each other's books.[7] They are a smaller partnership with less employees than was the organization in *Bellis*. That itself may not be of controlling import. But what is of great import is that they are not a "well organized and structured" organization and are indeed "merely a loose, informal association of [two] individuals." *Bellis, supra* at 93, 94 S.Ct. at 2185. They are also at most

5. *See* Md.Code Ann., Corp. & Ass'ns §§ 9–101 (definitions), 9–201 (elements of partnership), 9–308 (estoppel) (1975); *Myers v. Aragona*, 21 Md.App. 45, 54, 318 A.2d 263 (Ct. of Spec. Appeals), *cert. denied*, 272 Md. 746 (Ct. of Appeals) (1974); *Garner v. Garner*, 31 Md.App. 641, 645, 358 A.2d 583 (Ct. of Spec. App. 1976) (re intent). *See also McBriety v. Phillips*, 180 Md. 569, 577, 26 A.2d 400 (1942) (re estoppel).

6. Md.Code Ann., Corp. & Ass'ns § 9–308 (1975).

7. At one time during the 1976 proceedings (*see* n.2 *supra*), when it was anticipated that this Court would review, *in camera*, certain records and court files of the brothers, this Court expressed certain doubts with regard to the brothers' X claims of the lack of partnership status and stated it would reserve its determination in that regard pending completion of its *in camera* review. However, while in this Court's view the testimony of each of the brothers X does contain "puffing," that testimony is sufficiently credible and reliable to entitle the older brother X, in this case, to the findings of fact set forth in this opinion.

"a small family partnership." *Id.* at 101, 94 S.Ct. 2179. Mr. Justice Marshall, in the last paragraph of his opinion (at 101, 94 S.Ct. at 2189), reserved the question of whether "a small family partnership" would be treated differently than the Bellis firm because of family relationship or "if there were some other pre-existing relationship of confidentiality among the partners." *See also* Mr. Justice Douglas' reference in his dissent in *Bellis, id.* at 101, 103, 94 S.Ct. 2179, to "husband and wife" partnerships. But whether or not there exists a "small family" exception to the *Bellis* holding, *see United States v. Mahady & Mahady,* 512 F.2d 521 (3d Cir. 1975); *In the Matter of September 1975 Special Grand Jury,* 435 F.Supp. 538, 544–45 (N.D.Ind.1977), the brothers X were not a partnership, except by estoppel, and were in any event at most an unstructured and loose association of two individual practitioners of law. Therefore, the older brother X is entitled herein to be considered and treated as an individual practitioner and is not barred by the doctrine of *Bellis* from asserting his Fifth Amendment privilege.

## II

Since *Bellis,* the Supreme Court has handed down two very important opinions relating to the issues present in this case, *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), and *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

In *Andresen,* the Supreme Court held that the seizures of the business records of an attorney in searches, conducted pursuant to search warrants, of an attorney's law office, and of the office of a corporation of which that attorney was the sole shareholder, did not violate that attorney's Fifth Amendment rights. Herein, the Government seeks to proceed by way of subpoena, not search and seizure.

In *Fisher,* Mr. Justice White, speaking for the majority of the Court, held that the privilege against self-incrimination could not be successfully asserted to prevent a taxpayer under investigation for possible civil or criminal liability from being compelled, pursuant to IRS summonses, to produce work papers of his accountants relating to the preparation of the contested returns. The summonses were actually directed to the taxpayers' respective attorneys but the Fifth Amendment issue was considered by the Supreme Court not only in the light of the fact that the attorneys were in possession of the documents when the summonses were issued, but also as if the taxpayers themselves had had possession of the summonsed documents at that time. In *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), the Court had held that the "Fifth Amendment rights of a taxpayer were not violated by the enforcement of a documentary summons directed to her accountant and requiring production of the taxpayer's own records in the possession of the accountant." In *Fisher,* Mr. Justice White wrote that the taxpayers there involved were "compelled to do no more than was the taxpayer in *Couch.*" *Fisher v. United States, supra* 425 U.S. at 397, 96 S.Ct. at 1574.

*Bellis, Fisher* and *Andresen* all trace their roots to *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), which "held that 'any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime' would violate the Fifth Amendment privilege." *Bellis* 417 U.S. at 87, 94 S.Ct. at 2182, quoting from *Boyd* 116 U.S. at 630, 6 S.Ct. 524. In *Fisher,* Mr. Justice White, in his approach and in his words, seems to indicate that the Fifth Amendment privilege relates to a person's own papers prepared by himself for himself and not to papers prepared for him by another.[8]

---

8. In *Fisher* (at 410 n. 11, 96 S.Ct. at 1580), the majority opinion states:

    The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege,

*Wilson v. United States,* 221 U.S. 361, 378, 31 S.Ct. 538, 55 L.Ed. 771 (1911). * * *
*Wilson* dealt with a corporate president. *See also United States v. White,* 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) involving a

He also stressed that the privilege was aimed at preventing compelled testimony. In *Andresen*, the defendant was not required to do anything other than stand aside and permit the searches to take place pursuant to search warrants. In *Fisher*, the taxpayer, as Mr. Justice White himself recognized, was required to produce, and by so doing, to admit to the possession of his accountant's workpapers.[9] Mr. Justice White, however, considered that such admission was of "minimal testimonial significance" and observed that "[t]he documents would not be admissible in evidence against the taxpayer without authenticating testimony." *Fisher*, 425 U.S. at 412–13, 96 S.Ct. at 1582.

In this case, assuming this Court's findings and holdings *supra* in Part I as to the partnership *(Bellis)* issue, the documents sought are business or private documents of the older brother and relate to his own law practice. All of them, except perhaps the settlement sheets and the escrow account books, belong to and are held by him for himself alone.[10] All of the sought records are authored by the older brother, except for the bank books and bank statements, and except for any "records of settlements" authored by others, if any.[11]

The settlement sheets, any other settlement records and escrow accounts relate to particular clients or third persons. The parties agree that the settlement sheets in question were customarily prepared at least in duplicate by the attorney, with copies both for the client and himself, and disclose the amounts of the settlements and the distributions thereof, including the fees retained from the settlements by the target-attorney. As such the settlement sheets are business records of the attorney held by him as his own records and also held by him in his capacity as attorney for his respective clients. Any person, professional or other, who engages as a sole practitioner or as a sole proprietor in a service occupation, be he doctor, lawyer, dry-cleaner or plumber, usually retains records relating to his services and to payment to him therefor. The fact that, to some extent, such retention is a representative act, would not appear to deprive the sole practitioner or the sole proprietor from asserting that the copies of such papers which he retains are *his* own private business records. Nor does the fact that the settlement sheets were not private to the attorney, in the sense that the client has received a copy and that the client can communicate, if he desires, the contents of the document to others, deprive the attorney of his right to say that he has a right to

---

union official; *Molina v. United States*, 552 F.2d 898, 900 (9th Cir. 1977) involving a hotel banquet manager and records which were "clearly those of the hotel corporation."

**9.** The majority opinion concluded that the fact that the taxpayer's attorney, rather than the taxpayer himself, was in possession of the taxpayer's accountant's workpapers, at the time the summonses were issued, was immaterial.

**10.** The subpoena in this case would appear broad enough to cover personal papers and books of the older brother X as well as items used by the latter in his law practice. However, the Government, on the record, has stated that it does not seek the former—only the latter.

**11.** Such "others" are persons other than the older brother X and his younger brother and also other than the persons employed by the older brother X (*see* Finding 13, p. 5, *supra*). The younger brother and those employees acted only as assistants to the older brother X in the latter's conduct of his own practice of law. As such, they would not appear to be "outsid-

ers," like the accountants in *Fisher* and in *United States v. Beattie*, 522 F.2d 267 (2d Cir. 1975), *vacated and remanded*, 425 U.S. 967, 96 S.Ct. 2163, 48 L.Ed.2d 791 (1976), *modified on remand, per curiam*, 541 F.2d 329 (2d Cir. 1976), or like attorneys or others representing adversaries or their insurers in the matters settled by the older brother who is the target in this case, or like employees of the bank or banks who actually prepared bank statements and made entries thereon and in the savings account (escrow or other) books. There is nothing in *Bellis*, or *Fisher*, or seemingly in any other case known to this Court, to suggest that documents authored in whole or in part by an assistant to or a secretary for a sole proprietor or a sole practitioner, and at his direction and under his control, are not considered authored by that proprietor or practitioner for Fifth Amendment purposes. *Cf.* Mr. Justice Brennan's reference in his concurring opinion in *Fisher* (425 U.S. at 427, 96 S.Ct. 1569) to certain other "complexities" of modern life.

keep the information private subject only to the client's right to disclose.

█ The escrow account books held by the older brother X, whether they reflect open or closed bank accounts, and any settlement records authored by others, contain records of the attorney's handling of money held by him in the course of representing a given client. As such they are, among other things, the attorney's business records of such handling. But they are not writings of the older brother X. Neither are the bank statements. Thus, the escrow account books, and any settlement records authored by others, are different from the settlement sheets. The bank statements and any savings bank account books [12] are also different from those other items which the subpoena seeks and which relate generally to the affairs of the older brother rather than to his representation of specific clients, because they were authored by one or more banks, not by the older brother X. Any settlement records authored by others, the escrow bank books, other savings bank books and the bank statements would appear to be the only items sought by the subpoena in this case which are not authored by the Petitioner. As such, they would seem to occupy no higher status than the accountant's letters to the taxpayer in *United States v. Beattie,* 522 F.2d 267 (2d Cir. 1975), *vacated and remanded,* 425 U.S. 967, 96 S.Ct. 2163, 48 L.Ed.2d 791 (1976), *modified on remand, per curiam,* 541 F.2d 329 (2d Cir. 1976). Surely they are no more private to the Petitioner than those letters were to *Beattie.*

In the *Beattie* case, Judge Friendly held, prior to the Supreme Court's decision in *Fisher,* that an IRS summons to a taxpayer, directing production of workpapers of his accountant, could not be resisted by the taxpayer on Fifth Amendment grounds, but that copies of any communications between the taxpayer and his account were subject to the taxpayer's Fifth Amendment privilege. He reached that conclusion, relying (522 F.2d at 270) largely on Wigmore's approach that "if an accused is forced to produce his own papers, with the consequence that the prosecutor can put them in evidence without further ado, he is in effect forced to take the stand if he wishes to dispute or explain them." Subsequently, in his opinion, Judge Friendly also noted (522 F.2d at 279):

> Beattie [the taxpayer] is not being asked to admit anything by producing Robeson's [the accountant's] workpapers except the fact, inconsequential to any prosecution, that he received them long after the income tax returns were filed. Another consideration, already noted, shows how widely the two cases differ. In order to impeach or explain the foreign invoice after its introduction into evidence, the Boyds would have had to testify themselves and abandon the right of silence, which the privilege confers. This would be the case also with a personal letter received from another. But documents and records compiled by third persons for their own use cannot be introduced unless the prosecution calls their author or some other witness who can authenticate and explain them. The

---

**12.** It would appear that the words in the subpoena, "all other checking and savings bank accounts," refer to bank books and statements prepared by the bank. In any event, this Court so construes and limits those words.

The record contains no evidence concerning the definition of each of the banking type documents listed in the subpoena. This Court assumes that all of the entries in the savings account books, escrow and other, which are sought by the subpoena contain entries made solely by the bank. Insofar as "check vouchers" are concerned, this Court understands that "check vouchers" are usually referred to as "voucher checks" and that a "voucher check"

is a check, which has attached to it, a piece of paper which is not legally part of the check, but which the maker of the check uses to itemize or otherwise designate the purpose for which the check is drawn.

If either side desires to reopen the record to present evidence concerning the meaning of the banking terms used in the subpoena or to present evidence with regard to whether the bank or its customer is the author of any given banking type document which the subpoena seeks, such party may forthwith apply to this Court for the opportunity to have a further hearing in this case.

privilege no more protects Beattie against such testimony than it would have protected the Boyds against testimony by the English seller.[13]

After *Fisher,* the Supreme Court denied Beattie's petition for certiorari but granted the Government's and remanded the case. On remand, in *United States v. Beattie,* 541 F.2d 329 (2d Cir. 1976), in a *per curiam* opinion, a panel of the Second Circuit of which Judge Friendly was a member, wrote (at 330–31) as follows:

> The *Fisher* summons had not demanded copies of correspondence, 425 U.S. at 394 [96 S.Ct. 1569.] The summons in *Kasmir*[14] sought, *inter alia,* "[r]etained copies of reports and other correspondence" between the accountants and the taxpayer. While the Court ordered this portion of the summons enforced along with the rest, it made the following caveat, 425 U.S. at 413 n.13 [96 S.Ct. 1569]:
>
>> In seeking the accountant's "retained copies" of correspondence with the taxpayer in [*Kasmir*], we assume that the summons sought only "copies" of original letters sent from the accountants to the taxpayer—the truth of the contents of which could be testified to only by the accountant.
>
> *Kasmir* shows that so much of our previous decision as refused enforcement of the summons with respect to Robeson's retained copies of letters from him to Beattie was in error. The open question is whether the same conclusion follows with respect to letters from Beattie to Robeson of which Beattie had regained possession. That point was not at issue and consequently was not decided in *Fisher* or *Kasmir,* as the quoted footnote underlines. We think the rationale of the Court's opinion calls for upholding the privilege as to the taxpayer's own letters —unless, as the Government has not argued and the Court has not decided, 425 U.S. at 414, 96 S.Ct. at 1582, the Fifth Amendment does not "shield the taxpayer from producing his own tax records" repossessed from an accountant.

---

**13.** In *Fisher,* Mr. Justice White's analysis of the authentication issue includes the following (425 U.S. at 412–13, 96 S.Ct. at 1582):

> As for the possibility that responding to the subpoena would authenticate[12] the workpa-
>
> [12] The "implicit authentication" rationale appears to be the prevailing justification for the Fifth Amendment's application to documentary subpoenas. *Schmerber v. California,* 384 U.S. [757], at 763–764 [86 S.Ct. 1826, 16 L.Ed.2d 908] (1826) ("the privilege reaches . . . the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746]"); *Couch v. United States,* 409 U.S. [322], at 344, 346 [93 S.Ct. 611, 34 L.Ed.2d 548] (1973) (Marshall, J., dissenting) (the person complying with the subpoena "implicitly testifies that the evidence he brings forth is in fact the evidence demanded."); *United States v. Beattie,* 522 F.2d 267, 270 (C.A.2 1975) (Friendly, J.) ("[a] subpoena demanding that an accused produce his own records is . . . the equivalent of requiring him to take the stand and admit their genuineness"), cert. pending, Nos. 75–407, 75–700; 8 Wigmore, § 2264, p. 380 (the testimonial component involved in compliance with an order for production of documents or chattels "is the witness' assurance, compelled as an incident of the process, that the articles produced are the ones demanded"); McCormick

§ 126, p. 2168 ("[t]his rule [applying the Fifth Amendment privilege to documentary subpoenas] is defended on the theory that one who produces documents (or other matter) described in the subpoena duces tecum represents, by his production, that the documents produced are in fact the documents described in the subpoena"); *People v. Defore,* 242 N.Y. 13, 27, 150 N.E. 585 (1926) (Cardozo, J.) ("A defendant is 'protected from producing his documents in response to a subpoena duces tecum, for his production of them in court would be his voucher of their genuineness.' There would then be 'testimonial compulsion' ").

> pers, production would express nothing more than the taxpayer's belief that the papers are those described in the subpoena. The taxpayer would be no more competent to authenticate the accountant's workpapers or reports by producing them than he would be to authenticate them if testifying orally. The taxpayer did not prepare the papers and could not vouch for their accuracy. The documents would not be admissible in evidence against the taxpayer without authenticating testimony. Without more, responding to the subpoena in the circumstances before us would not appear to represent a substantial threat of self-incrimination. * * * [Footnote 13 omitted.]

**14.** *Fisher's* companion case in the Supreme Court.

By producing his own letters to the accountant, the taxpayer would be authenticating them as fully as if he were producing his retained copies. We do not read *Fisher* and *Kasmir* as detracting from the principle that the Fifth Amendment protects against compulsory production of a paper written by an accused with respect to his own affairs, contrast *Wilson v. United States,* 221 U.S. 361, 378 [31 S.Ct. 538, 55 L.Ed. 771] (1911), and now in his possession, even though he may have previously sent it to another with the expectation that the latter would retain it.

The Second Circuit's post-*Fisher* analysis guides this Court herein. Pursuant to it, the older brother X cannot successfully resist production of either the escrow or any savings bank books or of any of the bank statements, or of any settlement records authored by others. All of those bank books or bank records or settlement records were authored by the banks, or by third persons, not by the older brother X. None of those items would appear to be entitled to different treatment than written communications to Beattie from his accountant. But the result would appear otherwise as to all of the other documents subpoenaed herein including the settlement sheets. In reaching those conclusions, this Court has not lost sight of Mr. Justice White's final paragraph in *Fisher* (which is alluded to in the second *per curiam Beattie* opinion), in which Mr. Justice White wrote (425 U.S. at 414, 96 S.Ct. at 1582):

Whether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his "private papers," see *Boyd v. United States,* 116 U.S. 616, at 634–635, 6 S.Ct. 524, 29 L.Ed. 746. We do hold that compliance with a summons directing the taxpayer to produce the accountant's documents involved in these cases would involve no incriminating testimony within the protection of the Fifth Amendment.

All of the documents sought from Petitioner may perhaps be included within the description of "tax records" of Petitioner. Nevertheless, as the Second Circuit observed in the second *Beattie* case, the Supreme Court has not decided that all tax records are without the privilege. It is also to be noted that other federal courts, in post-*Fisher* opinions, have concluded that *Fisher* has not excluded *business* records authored by a target of a subpoena. Thus, in *United States v. LaPage,* 441 F.Supp. 824 (N.D.N.Y.1977), the Court stated (at 826) that the records sought by a grand jury subpoena were "business records" of a sole proprietorship [*i. e.,* a cattle operation] which the target could not be compelled to produce without being "compell[ed] . . to admit their existence, and inferentially at least, to authenticate them." However, the Court concluded (at 826) that the records had to be produced because they were records *required* to be kept by cattlemen under a New York state licensing statute and thus fell within the so-called "required records exception" to the Fifth Amendment privilege. *See Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), *cited in LaPage* (at 826).

In *United States v. Plesons,* 560 F.2d 890 (8th Cir. 1977), another post-*Fisher* case, the Eighth Circuit concluded that a doctor could have exercised his privilege against self-incrimination, if he had timely claimed it, not to produce patient records, stating (at 892–93):

In spite of the Supreme Court's recent observation that *Boyd,* in some aspects, has been narrowed through the years, *Fisher v. United States,* 425 U.S. 391, 407 [96 S.Ct. 1569, 48 L.Ed.2d 39] (1976), we feel the records here do come within the historic area of protection afforded by the fifth amendment to private documents. In the *Fisher* case the Court discussed, in the context of the attorney-client privilege, the theory which it felt justified the protection of documents as compelled *testimonial* communications under the fifth amendment. It is, the Court says, "[t]he 'implicit authentication' rationale [which] appears to be the pre-

vailing justification for the Fifth Amendment's application to documentary subpoenas." *Fisher v. United States, supra.* 425 U.S. at 412, n.12 [96 S.Ct. 1569.] Here, unlike the *Fisher* case where the taxpayer could not authenticate his accountant's workpapers, the doctor prepared the records and could vouch for their accuracy; his compliance with the subpoena in this case acted as an assurance that the patient records produced were the ones demanded. * * * [Footnote omitted; emphasis in original].

■ The extent to which *Fisher* and *Andresen* have eroded *Boyd* is not yet clear. *See The Supreme Court,* 1975 Term, 90 Harv.L.Rev. 1, 76–78 (1961). *See also United States v. Braswell,* 436 F.Supp. 669 (E.D. N.C.1977). The extent to which any authentication can be characterized as compelled testimony and the extent to which the authentication approach of Dean Wigmore and of Judge Friendly has present vitality is also not clear in the light of Mr. Justice White's writings in *Fisher.* The importance or non-importance of privacy in a Fifth Amendment context is questionable in the wake of the *Fisher* majority opinion, Mr. Justice Brennan's concurring views in *Fisher,* and Mr. Justice Blackmun's majority opinion in *Andresen.* So, perhaps, is the continuing viability of the unequivocal statement in the *Bellis* majority opinion that business as well as private writings are covered. But, as of this date, the privilege against self-incrimination would still appear to extend to business records authored by an attorney who is a sole practitioner of law, even if some of those records may have, in the past, been shown to or shared with one or more clients or others.

In *Fisher* (at 413, 96 S.Ct. 1582), Mr. Justice White noted that "[t]he taxpayer did not prepare the papers and could not vouch for their accuracy. The documents would not be admissible in evidence against the taxpayer without authenticating testimony." [15] In *Beattie* the target did prepare his letters to his accountant and could vouch for their accuracy and those letters would have been admissible in evidence against the target without authenticating testimony. The same is true with regard to all items sought herein which were authored by the older brother X and not by the bank, or by third persons.

For the reasons set forth *supra,* Petitioner's motion to quash the grand jury subpoena is granted and the Government's quest to enforce the subpoena is denied, except as to the settlement records authored by persons other than the older brother X, the savings account books, escrow and other, and the bank statements. With regard to the latter, Petitioner's motion to quash the grand jury subpoena is denied and the Government's quest to enforce the said subpoena is granted. The Order of this Court will not become effective until 10:00 A.M. on September 5, 1978 in order to permit either or both sides to seek appropriate ·appellate review and to obtain an Order further staying or altering this Court's Order.

---

**15.** Further, in *Fisher* at 410 n.11, 96 S.Ct. at 1580, Mr. Justice White noted:

In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded. McCormick § 128, p. 269.